UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
RSUI INDEMNITY CO.,                                       :
                                                          :          08 Civ. 7218 (PAE)
                                      Plaintiff,          :
                                                          :          OPINION & ORDER
                   -v-                                    :
                                                          :
RCG GROUP (USA), et al.,                                  :
                                                          :
                                      Defendants.         :
                                                          :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On March 15, 2008, a tower crane constructing a residential high-rise development at 303

East 51st Street in Manhattan collapsed, killing seven people and injuring dozens more (the

"Accident").  This case involves one of the myriad insurance claims generated by the Accident.

Insurer RSUI Indemnity Company ("RSUI") seeks a declaratory judgment that it owes no

coverage under a policy (the "Policy") issued to defendants RCG Group, Reliance Construction,

Inc. (collectively, "RCG") and East 51st Street Development Company and its affiliates ("E51"

and, with RCG, "defendants") for their actions in relation to that crane collapse.  RCG and E51

filed a negative-image counterclaim, seeking a declaratory judgment that the Policy covers any

liability they may incur as a result of the Accident.  Discovery having concluded, the parties

cross-move for summary judgment on the question of whether the residential work exclusion in

the Policy bars coverage.  For the following reasons, the Court concludes that it does.

Accordingly, RSUI's motion is granted and RCG's and E51's cross-motion is denied.

I.      **Undisputed Facts**[1]

RCG is a Canadian company with expertise in building offices, retail and commercial

buildings, and condominiums.  JSF ¶ 1.  E51 is a New York corporation which owned the site,

303 East 51st Street ("303 East 51st"), at which the Accident occurred.  *Id.* ¶ 2.  RSUI is an

insurance company organized under the laws of New Hampshire, but with a principal place of

business in Atlanta, Georgia.  *Id.* ¶ 5.

A.      **E51 and RCG Agree to Pursue the Project at 303 East 51st**

On or about March 21, 2007, E51 entered into an agreement with RCG, whereby RCG

would begin initial construction work at 303 East 51st.  *Id.* ¶ 6.  The agreement required RCG

and its subcontractors to procure and maintain liability insurance, with a minimum limit of $1

million per occurrence and $2 million in the aggregate, and to name E51 and its affiliates as

additional insureds.  *Id.* ¶ 11.  The agreement also required RCG and its contractors to procure

excess coverage with limits of $25 million per occurrence, with a minimum limit of $5 million

for subcontractors.  *Id.* ¶ 12.

On January 28, 2008, RCG and East 51st signed another agreement, the construction

management agreement, pursuant to which RCG would, *inter alia*, provide supplies and services,

and supervise, direct, and control all aspects of the construction, including the hiring,

supervision, and control of all subcontractors on site.  *Id.* ¶ 21.[2]  The construction management

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' Joint
Stipulation of Undisputed Facts ("JSF") (Dkt. 196), which the Court requested the parties file in
lieu of a Local Rule 56.1 Statement.  The Court thanks counsel for their professionalism,
diligence, and cooperation, as reflected in their working together, after more than three years of
litigation, to develop such a thoroughgoing recitation of the facts.

[2] RCG appears to dispute whether this agreement was ever enforceable.  *See, e.g.*, JSF ¶¶ 15–16.
Neither party, however, argues that whether the construction agreement is binding is dispositive

agreement also provided for RCG to obtain liability insurance for the project, naming E51 as an additional insured.  *Id.* ¶ 22.  RCG ultimately obtained, on July 4, 2007 for a one-year period, a primary commercial general liability policy from Interstate Fire and Casualty Company.  *Id.* ¶¶ 57–58.  That policy included an "additional insured" endorsement, providing coverage for "[a]ny person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy."  *Id.* ¶ 60.  E51 was thus included as an additional insured on RCG's primary policy.

### B.    RSUI Negotiates with RCG to Provide Insurance, and the Policy's "Residential Work" Exclusion

In March 2006, RSUI received, through its insurance broker, an invitation to provide an excess liability coverage quote to RCG's broker.  *Id.* ¶ 33.  Throughout the spring of 2006, RSUI and RCG, through their respective broker intermediaries, negotiated the terms of the proposed insurance.  *Id.* ¶¶ 34–42.[3]  At the end of those negotiations, RSUI issued a commercial excess liability policy to RCG for the policy period of July 4, 2006 to July 4, 2007.  *Id.* ¶ 44.  On or about July 10, 2006, RSUI issued to RCG a binder for the 2006 to 2007 policy.  *Id.* ¶ 43.  That policy was subsequently renewed on July 3, 2007, for the July 4, 2007 to July 4, 2008 policy year.  *Id.* ¶ 56.

That policy provided a limit of liability in the amount of $19 million, excess of underlying insurance of $1 million for each occurrence and $2 million aggregate.  *Id.* ¶ 44.

---

of this motion; the Court, therefore, does not address that issue.

[3] Because neither party relies on any statement made during those negotiations—relying instead on the language of the resulting contract—the Court need not rehearse those negotiations at length.

Important here, the binder incorporated in the policy included an attachment entitled "Exclusion

– Residential Work."  *Id.* ¶ 43.  That exclusion provides:

> This insurance does not apply to any liability arising out of your operations or "your work" on any "residential project."

> "Residential Project" shall mean apartments, single and multi family dwellings, townhouses, duplexes, condominiums, or cooperatives (including any project converted for individual or collective resident ownership), "mixed-use buildings" or any other place of domicile, and shall include appurtenant structures and common areas.

> "Mixed-use buildings" shall mean structures and improvements thereto, which contain both residential units and commercial space.

> "Your work" and "suit" shall be as defined in the "underlying insurance."

> However, this exclusion does not apply to your operations or "your work" that is on or in commercial space in "mixed-use buildings."

> We shall have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded by this endorsement.

*Id.* ¶ 46 (the "Residential Work Exclusion" or "Exclusion").  The Exclusion thus contains an

exception for "'your work' that is on or in commercial space in a 'mixed-use building.'"  *Id.* (the

"Exception").  In turn, the "underlying policy"—issued by Interstate—defined "your work" as

follows:

> "Your work" means:

> a.  Work or operations performed by you or on your behalf; and

> b.  Materials, parts, or equipment furnished in connection with such work or operations.

> "Your work" includes:

> a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

> b.  The providing or of failure to provide warnings or instruction.

[4]

*Id.* ¶ 77.

####     C.     The Construction Project

The construction management agreement between RCG and E51 states that E51 "desires to have developed and designed and constructed" a "Project" comprised of four "Subprojects": (1) the "high-rise residential condominium building" at 303 East 51st combined with an adjacent townhouse at 309 East 51st Street; (2) an adjacent loft condominium building at 964 Second Avenue; (3) a number of adjacent two-story commercial spaces at 968 Second Avenue, 972 Second Avenue, 974 Second Avenue, and 976 Second Avenue; and (4) a renovation of a townhouse at 304 East 52nd Street.  *Id.* ¶ 101.

From the period before construction began to the date of the Accident, E51 retained a number of professional consultants to prepare plans, drawings, and other specifications which became incorporated into the arrangement between E51 and RCG.  *Id.* ¶ 104.  Many of these drawings and plans were submitted to governmental agencies, including the New York City Department of Buildings ("DOB"), for approval.  Witnesses from both E51 and RCG have testified—and those parties do not dispute—that the building was built in accordance with those plans.  *Id.* ¶¶ 106–09.

A central issue in this case is whether the primary building at issue—303 East 51st—was solely residential, or contained commercial space as well, such that it is fairly described at "mixed-use."

303 East 51st has been generally described by several documents and role players as a "mixed-use" building—*i.e.*, containing both residential and commercial elements.  Two letters from the project's architects, dated March 10, 2006 and June 18, 2007, both described it as a "mixed-use" project.  *Id.* ¶ 110.  Similarly, an executive of E51 stated in an affidavit that "East

51st Street did not intend and was not constructing the building to be solely residential." *Id.* ¶ 111. However, other contemporaneous documents are in tension with a finding that the building was "mixed-use." For example, another E51 executive who executed a personal guaranty agreement with RCG described the building in that letter agreement as a "residential" tower. *Id.* ¶ 112. Both E51 and RCG have filed documents in New York state court, in cases arising out of the construction, which describe the building as a "residential" tower. *Id.* ¶¶ 113–14.

There are a number of specific areas of the building as to which the parties disagree on the proper characterization, in particular, whether the area was intended for any commercial use.

*First, the cellar.* Witnesses from E51 testified in depositions that 303 East 51st was designed and built to have commercial storage space in its cellar. *Id.* ¶ 115. An RCG witness, however, testified that an architectural drawing from January 2008—not long before the Accident—depicted the cellar as housing mechanical units and storage space for the use of the building's residents only—*i.e.*, not commercially-available storage. *Id.* ¶ 116. Additionally, a March 13, 2008 architectural application to the DOB—made only two days before the Accident—identified the proposed use of the building's cellar as "residential accessory storage space" and "mechanical rooms, electrical rooms, compactor room, break room, bathroom, supers office, and supers workshop." *Id.* ¶ 158. Also on March 13, 2008, E51 submitted an "Offering Plan" for 303 East 51st to the New York State Attorney General's Office. *Id.* ¶ 159. That plan states that the offeror would sell licenses to 89 storage bins in the cellar, "which License Owners (other than Sponsor) must at all times be Unit Owners, or owners of units in Proposed Condominiums or Rental Buildings." *Id.* ¶ 168.

*Second, the third floor.* Two E51 witnesses and one RCG witness testified that, once the commercial buildings on Second Avenue (directly to the west of 303 East 51st) were completed,

[6]

there were to be one or more "knock outs" or passageways constructed between that complex of buildings and the third floor of 303 East 51st's southwest side.  *Id.* ¶¶ 117, 120–24.  Indeed, according to both R51 and RCG witnesses, the entire west side of the third floor of 303 East 51st was built without walls or windows, so that these "knock outs" could be added.  *Id.* ¶ 121. Additionally, an RCG witness also testified that a portion of the third floor of 303 East 51st was intended to house storage space for the commercial tenants of the new buildings to the west, on Second Avenue.  *Id.* ¶ 119.  In contrast to this testimony from E51 and RCG witnesses, RSUI's expert testified that no architectural drawing submitted to or approved by DOB depicted access ways between 303 East 51st and the adjacent commercial buildings.  *Id.* ¶ 130.  The March 13, 2008 application to DOB proposed the following uses for the third floor:  "two class A apartments, mechanical room."  *Id.* ¶ 158.  The March 13, 2008 Offering Plan indicated that E51 reserved the right to connect 303 East 51st to "adjacent buildings," but did not specify from which floor such connection would be made, or identify whether any such connection would be to commercial space or used for a commercial purpose.  *Id.* ¶ 164.

*Third, the ground floor.*  A number of documents generated during the construction process, refer to a "storefront" on the ground floor of 303 East 51st.  These documents include (1) a budget spreadsheet generated by RCG; (2) a construction schedule; (3) a cost estimate, drawing upon a budget report; and (4) architectural drawings dated January 25, 2008.  *Id.* ¶¶ 134–38.  The March 13, 2008 Offering Plan described 303 East 51st as containing 181 residential units, and one commercial unit.  *Id.* ¶ 160.

The parties also dispute whether the ground floor was to contain "community space." RCG and E51 witnesses have both testified that 303 East 51st was intended to have "community

[7]

space" on the building's first floor. *Id.* ¶ 141.[4]  RCG's witnesses testified that this area was intended to be accessible not only by the building's residents, but also by the general public, and that it was to become a children's center upon the building's completion. *Id.* ¶¶ 142–43.  The March 13, 2008 DOB application described the ground floor's proposed uses as "residential lobby," "mail room," "electric closet," and "community facility," while the Offering Plan of the same date describes a community facility "on the Ground Floor which may be used for any lawful purpose." *Id.* ¶¶ 158, 161.

> **D.     The Accident**

Due to the building's height, construction of 303 East 51st required a tower crane. *Id.* ¶ 172.  The crane was first used in January 2008, when construction surpassed the ninth floor; the crane was, at that time, attached at the third and ninth floors on the building's south side. *Id.*  As the building grew taller, the crane periodically was raised, or "jumped," up the side of the building. *Id.* ¶ 174.  The tower crane was erected by Stroh Engineering Services, P.C., a contractor hired by Joy, a subcontractor retained by RCG. *Id.* ¶ 175.  The crane was operated and "jumped" by Rapetti Rigging, another contractor retained by Joy. *Id.* ¶ 176.

Before March 15, 2008, the crane was attached to the building solely at the third and ninth floors, and was stabilized there by a number of steel girders attached to the building, which were in turn attached to a "collar" around the crane's superstructure. *Id.* ¶ 177–78.  On March 15, 2008, the crane was scheduled to be "jumped" from the 18th floor to the 23rd floor, and was to make a new attachment point at the 18th floor of the building. *Id.* ¶ 176.  No work was being done that day on the crane's third floor attachment point—the only work scheduled for that day on the third floor was cleaning, constructing a temporary plywood table, and making a door. *Id.*

---

[4] An E51 witness also claimed that part of the building' second floor was to be included in the community space. *Id.* ¶ 144.

¶ 182.  While the crane was being "jumped," it collapsed, killing seven people, injuring dozens more, and causing many millions of dollars in property damage.  *Id.* ¶ 179.

>    E.    **Post-Accident Litigation**

More than 50 tort or tort-related lawsuits have been filed in New York State court as a result of the Accident, with the majority having been consolidated into one action under the caption *In re East 51st Street Crane Collapse Litigation*.  *Id.* ¶¶ 184–85.  E51 and RCG are named as defendants or third-party defendants in each of the cases.  *Id.* ¶ 186.  The general thrust of the underlying actions is that defendants, including E51, RCG, Rapetti, and Stroh were negligent in carrying out their duties to provide safe equipment, adequate safety devices, and a safe work place.  *Id.* ¶ 187.  A number of the actions arise specifically out of the injuries of those who survived, but were injured in, the Accident.  *See generally id.* ¶¶ 189–204.  Seven lawsuits seek damages for wrongful death, asserting E51's and RCG's responsibility by virtue of their ownership and/or management of the building site at the time of the Accident.  *Id.* ¶¶ 205–07.  Another 34 lawsuits seek recompense for property damage suffered by those who lived and worked near the construction site.  *Id.* ¶ 215.

## II.    Procedural History

On or about April 9, 2008, RCG's counsel delivered a written notice letter to RSUI detailing the crane collapse, and the resulting deaths, injuries, and property damage.  *Id.* ¶ 235.  On or about May 6, 2008, RSUI delivered a responsive letter disclaiming coverage for all claims and suits arising out of the Accident.  *Id.* ¶ 237.  In late August 2008, E51 similarly notified RSUI of the Accident and resulting claims and suits resulting therefrom.  *Id.* ¶ 239.  On or about

September 22, 2008, RSUI replied to E51, as it had to RCG, disclaiming all coverage for the Accident.  *Id.* ¶ 240.[5]

On August 13, 2008, RSUI commenced this declaratory judgment action, seeking a declaration of its rights and responsibilities vis a vis E51 and RCG arising out of the Accident. Dkt. 1.[6]  On November 7, 2011, after the parties conducted approximately three years of discovery, the Court held a conference to discuss the parties' expressed desire to cross-move for summary judgment on the issue of the Residential Work Exclusion.  *See* Dkt. 189.  On January 20, 2012, pursuant to the Court's suggestion, the parties filed a 308-paragraph Joint Stipulation of Facts for the purposes of resolving these cross-motions.  *See* Dkt. 195.  On February 17, 2012, RSUI filed its motion.  Dkt. 209–10.  On March 16, 2012, E51 and RCG filed their cross-motion, accompanied by a memorandum of law which both opposed RSUI's motion and supported their own.  Dkt. 213–14.  On March 30, 2012, RSUI filed a memorandum of law functioning as both a reply in further support of its own motion, and an opposition to RCG and E51's motion.  Dkt. 216.  On April 13, 2012, E51 and RCG filed a reply memorandum of law in further support of their cross-motion.  Dkt. 219.

## III.    The Parties' Arguments

In support of its motion, RSUI argues that the plain language of the Residential Work Exclusion bars coverage because 303 East 51st, as it was being constructed at the time of the Accident, was a purely residential structure.  However, RSUI argues, even if the Court finds that 303 East 51st contained commercial or community space, it is, at best, a "mixed-use" building

---

[5] This process has been repeated numerous times as both RCG and E51 have notified RSUI of each new Accident-related lawsuit as it was filed.  *See id.* ¶¶ 238, 240.

[6] This case was initially assigned to the Hon. Colleen McMahon, and then to the Hon. Deborah A. Batts.  The case was reassigned to this Court on October 14, 2011.  *See* Dkt. 187.

equally covered by the Exclusion, and the Exception to the Residential Work Exclusion—permitting coverage for actions arising out of work done in commercial areas in mixed-use buildings—does not apply in this case, because the tower crane was not used on any portion of the building that may have been even arguably commercial.

E51 and RCG counter that the building was neither purely residential, nor "mixed-use" for purposes of the Policy, because the Policy defined "mixed-use" as having both residential and commercial space, whereas 303 East 51st had residential, commercial, *and community* space. However, E51 and RCG argue, even if the Exclusion does apply in the first instance, the Exception to the Exclusion is applicable, because the tower crane's attachment to the building is a central issue in the underlying tort cases, and one attachment point was on the building's third floor, in the portion which E51 and RCG claim was commercial space.[7]

## IV.    Summary Judgment Standard

Summary judgment may be granted only where the submissions, taken together, "show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court faced with cross-motions for summary judgment,

---

[7] The parties have used considerable portions of their briefs to spar about issues that are collateral to the decision on this motion.  First, the defendants argue that the observations of RSUI's expert witness, Dr. Bramel, should be disregarded because he was not an eyewitness to the building's construction; Dr. Bramel testified that 303 East 51st was purely residential.  *See* Defs.' Br. 27–29.  This dispute is irrelevant, however, because, for the reasons that follow, the Court is unpersuaded by defendants' arguments on the merits even disregarding Dr. Bramel's testimony and even assuming as true defendants' contrary assertions that the building had both "commercial space" and "community space."  Second, RSUI argues forcefully that 303 East 51st could have been legally constructed only in conformance with the architectural drawings submitted to DOB, and, because Dr. Bramel has testified that no drawings were submitted to DOB reflecting  either "commercial" or "community" space, the building was, therefore, purely residential.  *See* Pl.'s Br. 12–16.  The Court, in ruling for RSUI, does not rely on that argument.  In the same vein, because RSUI has not sought to avoid coverage on the ground that RCG and E51 were constructing the building in violation of applicable law, discussion of New York building codes is, also, beside the point.

"need not grant judgment as a matter of law for one side or the other." *Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, No. 11-cv-3656, 2012 U.S. Dist. LEXIS 95693, at \*37 (S.D.N.Y. July 9, 2012) (citing *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 140 (S.D.N.Y. 2004)) (internal quotation marks omitted).  Each movant bears the burden of demonstrating the absence of a material factual question; in making this determination, the Court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  In undertaking this analysis, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Ed.*, 667 F.2d 305, 313–14 (2d Cir. 1981) (internal citations omitted)).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Additionally, even where a motion for summary judgment is denied, the Court may "enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); *see also Pensioenfonds Metaal en Techniek v. Strategic DSRG, LLC*, No. 09-cv-5644, 2011 U.S. Dist. LEXIS 9624, at \*18 (S.D.N.Y. Jan. 24, 2011).

**V.   Discussion**

The parties' cross-motions can be reduced to two primary issues:  (1) is the Exclusion applicable in the first instance—*i.e.*, is the building solely residential or a "mixed-use" building as defined in the Policy; and (2) if so, does the Exception to the Exclusion nonetheless apply to permit coverage for E51 and RCG?  These points are addressed, in order, after a review of applicable New York insurance law.

### A.    Principles of New York Insurance Law

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006); *see also Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995); *St. Paul Fire & Marine Ins. Co. v. Novus Int'l, Inc.*, No. 09-cv-1108, 2011 U.S. Dist. LEXIS 150317, at *23 (S.D.N.Y. Dec. 28, 2011).  "[I]nsurance policies are read in light of 'common speech' and the reasonable expectations of a businessperson." *Barney Greengrass, Inc. v. Lumbermens Mut. Cas. Co.*, 445 F. App'x 411, 414 (2d Cir. 2011) (summ. order) (quoting *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003)); *see also Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983).  "When the provisions are unambiguous and understandable, courts are to enforce them as written." *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999)); *see also Essex Ins. Co. v. Laruccia Constr., Inc.*, 71 A.D.3d 818, 819 (2d Dep't 2010) (under New York law, courts must give "unambiguous provisions of an insurance contract . . . their plain and ordinary meaning").

"The initial interpretation of a contract 'is a matter of law for the court to decide.'" *10 Ellicott Square Court Corp. v. Mt. Valley Indem. Co.*, 634 F.3d 112, 119 n.8 (2d Cir. 2010)

(quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000));
*see also White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).  "Part of this threshold
interpretation is the question of whether the terms of the insurance contract are ambiguous."
*Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Alexander & Alexander Servs., Inc. v.
These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)).

     "It is well settled that [a] contract is unambiguous if the language it uses has a definite
and precise meaning, unattended by danger of misconception in the purport of the [agreement]
itself, and concerning which there is no reasonable basis for a difference of opinion."  *White*, 9
N.Y.3d at 267 (citing *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)) (brackets in
original, additional citation and internal quotation marks omitted).  Conversely, "[a]n ambiguity
exists where the terms of an insurance contract could suggest 'more than one meaning when
viewed objectively by a reasonably intelligent person who has examined the context of the entire
integrated agreement and who is cognizant of the customs, practices, usages and terminology as
generally understood in the particular trade or business.'"  *Parks Real Estate Purchasing Grp.*,
472 F.3d at 42 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997))
(citation and additional internal quotation marks omitted); *see also U.S. Licensing Assocs. v. Rob
Nelson Co.*, No. 11-cv-4517, 2012 U.S. Dist. LEXIS 58712, at *8 (S.D.N.Y. Apr. 26, 2012).

     "[I]f the language of [an] insurance contract is ambiguous . . . the parties may submit
extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of
fact."  *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985); *see also Green Harbour
Homeowners' Assn., Inc. v. Chicago Title Ins. Co.*, 74 A.D.3d 1655, 1658 (3d Dep't 2010).  If
the extrinsic evidence fails to cure the ambiguity, however, "the ambiguity . . . [must] be
resolved against the insurer which drafted the contract."  *Home Indem. Co.*, 66 N.Y.2d at 671;

[14]

*see also White*, 9 N.Y.3d at 267 (citing *United States Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d

229, 232 (1986)); *see also Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 218

(S.D.N.Y. 2010); *Hunt v. Ciminelli-Cowper Co., Inc.*, 93 A.D.3d 1152, 1154 (4th Dep't 2012);

*Appleby v. Chicago Title Ins. Co.*, 80 A.D.3d 546, 549 (2d Dep't 2011); *Tower Ins. Co. of N.Y. v.

Diaz*, 58 A.D.3d 495, 496 (1st Dep't 2009). This principle derives from the common law

doctrine of *contra proferentem*, which holds that, in the case of insurance contracts, "drawn as

they ordinarily are by the insurer," *Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 678 (1976), "it is the

insurance company which has the responsibility of making its intention clearly known."

*Stainless, Inc. v. Emp'rs Fire Ins. Co.*, 69 A.D.2d 27, 33 (1st Dep't 1979).

      Where, as here, an insurer "claims that an exclusion in the policy applies to an otherwise

covered loss," the "insurer bears the burden of proof" to demonstrate that the exclusion applies.

*Morgan Stanley Group*, 225 F.3d at 276 n.1; *see also MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152,

158 (2d Cir. 2011); *Bianchi v. Lorists' Mut. Ins. Co.*, 422 F. App'x 56, 58 (2d Cir. 2011) (summ.

order) (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256–57 (2d Cir.

2004)); *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 444 (2002)

(in context of insurer's duty to defend, "[w]hen an exclusion clause is relied upon to deny

coverage, the burden rests upon the insurance company to demonstrate that the allegations of the

complaint can be interpreted only to exclude coverage"); *Consol. Edison Co. of N.Y. v. Allstate

Ins. Co.*, 98 N.Y.2d 208, 220 (2002) ("Once coverage is established, the insurer bears the burden

of proving that an exclusion applies"). "[T]o 'negate coverage by virtue of an exclusion, an

insurer must establish that the exclusion is stated in clear and unmistakable language, is subject

to no other reasonable interpretation, and applies in the particular case.'" *Inc. Vill. of Cedarhurst

v. Hanover Ins. Co.*, 89 N.Y.2d 293, 298 (1996) (quoting *Cont'l Cas. Co. v. Rapid-American*

*Corp.*, 80 N.Y.2d 640, 652 (1993)).  "Policy exclusions 'are not to be extended by interpretation

or implication, but are to be accorded a strict and narrow construction.'"  *Inc. Vill. of Cedarhurst*,

89 N.Y.2d at 298 (quoting *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984)); *see

also Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 18 N.Y.3d 642, 649 (2012).

     However, where an insurer has shown that an exclusion applies, "'[a]n insured must

demonstrate that an exception to an exclusion applies where coverage rests on the application of

such exception.'"  *CGS Indus. v. Charter Oak Fire Ins. Co.*, 777 F. Supp. 2d 454, 460 (E.D.N.Y.

2011) (quoting *Monteleone v. Crow Constr. Co.*, 242 A.D.2d 135, 140 (1st Dep't 1998)); *see

also Bedford Affiliates v. Manheimer*, 86 F. Supp. 2d 67, 75 (E.D.N.Y. 1999); *State v.

Schenectady Hardware & Elec. Co.*, 223 A.D.2d 783, 784 (3d Dep't 1996); *State v. U.W. Marx,

Inc.*, 209 A.D.2d 784, 785 (3d Dep't 1994); *Longwood Cent. Sch. Dist. v. Commerce & Indus.

Ins. Co.*, No. 23402/09, 2012 N.Y. Misc. LEXIS 2690, at *11 (Sup. Ct. Nassau Cty. May 22,

2012); *Sigma Contr. Corp. v. Everest Nat'l Ins. Co.*, 907 N.Y.S.2d 104, 2010 N.Y. Misc. LEXIS

405, at *27 (Sup. Ct. Kings Cty. Jan. 30, 2010); *Martinez v. Colasanto Constr., Inc.*, 906

N.Y.S.2d 781, 2009 N.Y. Misc. LEXIS 3539, at *50 (Sup. Ct. Kings. Cty. Aug. 27, 2009); *OTC

Int'l, Ltd. v. Underwriters at Lloyd's of London Subscribing to Policy of Ins. No.

HN99ABXC255*, 781 N.Y.S.2d 626, 2004 N.Y. Misc. LEXIS 49, at *3(Sup. Ct. Qns. Cty. Jan.

29, 2004); *Travelers Ins. Co. v. Nory Constr. Co.*, 708 N.Y.S.2d 252, 255 (Sup. Ct. Monroe Cty.

Apr. 18, 2000).[8]

     **B.**    **Is the Exclusion Applicable?**

---

[8] The Court notes that earlier precedents of both this Court and the Second Circuit have held to
the contrary.  *See, e.g.*, *New York v. Blank*, 27 F.3d 783, 789 (2d Cir. 1994) ("where an exclusion
allows for an exception, the insurer bears the burden of showing that the exception to that
exclusion does not apply"); *Town of Union v. Travelers Indem. Co.*, 906 F. Supp. 782, 787
(S.D.N.Y. 1995) (same) (citing *Blank*).  Those precedents appear to have been overtaken by
subsequent developments in New York insurance law.

[16]

By way of review, the Exclusion provides that: "This insurance does not apply to any liability arising out of your operations or 'your work' on any 'residential project.'" "Residential project," in turn, is defined as: "apartments, single and multi family dwellings, townhouses, duplexes, condominiums, or cooperatives (including any project converted for individual or collective resident ownership), 'mixed-use buildings' or any other place of domicile, and shall include appurtenant structures and common areas." "Mixed-use buildings" is defined as "structures and improvements thereto, which contain both residential units and commercial space."

RSUI argues that the Residential Work Exclusion in the Policy applies to deprive RCG and E51 of coverage for liability arising out of the Accident.  RCG and E51 argue that the Exclusion does not apply, because the building (1) is not solely residential, and (2) is not "mixed-use" as defined in the Exclusion, because it contains community space in addition to residential space and commercial space.  Based on the facts stipulated to by the parties, the Court holds that the Exclusion applies, because, on those facts, the building is clearly "mixed-use" as defined in the Exclusion.

The Court first addresses the portion of the Exclusion applicable to solely residential buildings.  There is sufficient evidence within the record to prevent a grant of summary judgment to RSUI on that ground, because there are facts among those stipulated by the parties to generating a triable issue as to whether the building was intended to, and was being constructed to, contain some sort of commercial space.  This evidence includes, but is not limited to: (1) budget spreadsheets referring to "aluminum storefronts"; (2) a construction schedule describing certain portions of the building as non-residential, and setting a timeframe for the construction of storefronts; and (3) an architect's drawings including details of storefronts.  Thus, to the extent

that RSUI's summary judgment motion argues that 303 East 51st was indisputably and wholly

residential, the motion is denied.

RSUI's summary motion, however, is meritorious insofar as it contends that 303 East

51st was a "mixed-use" building under the definition provided in the Policy.  E51 and RCG

counter that although a building containing residential and commercial uses is a "mixed-use"

building, a building that contains both of those uses *and also* community space is not a "mixed-

use" building.  That construction of this Policy term is quite unpersuasive.

"[T]he cardinal principle for the construction and interpretation of insurance contracts—

as with all contracts—is that the intentions of the parties should control.  Unless otherwise

indicated, words should be given the meanings ordinarily ascribed to them and absurd results

should be avoided."  *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154,

184 (2d Cir. 2003), *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt*, 546

U.S. 303 (2006).[9]  And, although exclusions are to be construed narrowly, and may not "be

extended by interpretation or implication," *Inc. Vill. of Cedarhurst*, 89 N.Y.2d at 298, neither

may the Court disregard the plain language of the parties' agreement to infer obstacles to

exclusion where none appear in the Policy.  *Cf.* N.Y. Jur. 2d Insurance § 853 ("[I]n the process

of resolving ambiguities in favor of the insured, the court is not privileged to disregard or distort

language of a policy which is plain and unequivocal in order to find for an insured and is not

---

[9] *See also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 n.9 (2d Cir. 2007) ("canons of construction forbid contractual interpretations that lead to absurd results"); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005); *Vector Capital Corp. v. Ness Techs. Inc.*, No. 11-cv-6259, 2012 U.S. Dist. LEXIS 36847, at *8–9 (S.D.N.Y. Mar. 16, 2012) (under New York law, "a court should not interpret a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties") (internal quotation marks omitted); *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 463–64 (S.D.N.Y. 2009) ("[A]n interpretation that gives a reasonable and effective meaning to all of a contract is generally preferred to one that leaves a part unreasonable or of no effect").

[18]

authorized to make a new contract for the parties, to disregard the evidence as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties.").  Policy exclusions, like grants of coverage, are manifestations of the parties' private negotiations and business judgment.  Their form and breadth reflect the balance of risks and benefits the parties achieved in those negotiations.  Just as an insured's purchase of insurance coverage lays off certain risks, an insured's assent to exclusions in that coverage is an assumption of liability that the insured has bargained for.  *See XL Specialty Ins. Co. v. Level Global Investors, L.P.*, No. 12-cv-1598, 2012 U.S. Dist. LEXIS 82164, at *64–65 (S.D.N.Y. June 13, 2012) (citing, *inter alia*, *Gluck v. Exec. Risk Indem., Inc.*, 680 F. Supp. 2d 406, 418 (E.D.N.Y. 2010)).

      Even assuming the truth of all of defendants' factual  assertions—that the building includes commercial and community space, in addition to residential space—the term "mixed-use" as defined in the Policy plainly describes 303 East 51st:  it is, literally, a building which "contain[s] both residential units and commercial space."[10]  The plain language of the Policy is not plausibly read any other way.  Nor have RCG and E51 pointed to any evidence in the record indicating that the parties (contrary to the clear definition of "mixed-use") intended for this list to be exclusive, *i.e.*, to mean that a building was "mixed-use" only if it consisted *exclusively* of residential units and commercial space.  Rather, the only reasonable reading of this provision, "in light of common speech," *Barney Greengrass*, 445 F. App'x at 414, is that the Exclusion applies

---

[10] If a building had a residential use and also community space, but no commercial use, it then would not appear to qualify as "mixed-use" space as defined.  However, RCG and R51 have not made any such claim.  They instead have argued, and adduced evidence, that the building contained commercial space.  Because the Court has denied one portion of RSUI's motion for summary judgment based on defendants' sworn testimony that the building was to contain commercial space, there would be a substantial argument that RCG and E51 would be estopped from arguing on this alternative ground that the building was not a "mixed-use."  *See, e.g.*, *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397–98 (2d Cir. 2011).

where a building has residential units and commercial units, regardless of whether or not spaces in the building are also put to other uses.

Additionally, the Court finds inapposite or unpersuasive four cases cited by RCG and E51 in support of their claim that the existence of "community" space makes the Exclusion inapplicable.  Defendants primarily rely on *Bovis Lend Leave LMB Inc. v. Royal Surplus Lines Ins. Co.*, 27 A.D.3d 84 (1st Dep't 2005).  There, the First Department held that a residential work exclusion did not apply where the exclusion covered "apartments, single family and multi-family dwellings, condominiums and townhouses," but where the building was mixed-use, in that it contained housing units and also units intended for other purposes, including a school.  27 A.D.3d at 93-94.  Finding the exclusion inapplicable, the court explained:

> "Mixed-use buildings" are not included in the exclusion's list of the types of buildings that constitute residential property.  Indeed, only specific single-use dwellings are included in the list, and it certainly is reasonable to interpret the exclusion as inapplicable to mixed-use buildings.

*Id.* at 94.

*Bovis* is clearly distinguishable.  Simply put, under the policy at issue, mixed-use buildings fell outside the definition of residential property: The policy, in defining the residential work exclusion, did not indicate that that exclusion applied where the building had mixed uses. By contrast, here, both residential-only uses and mixed-uses are, separately, excluded.  *Bovis* does not shed light on the issue of whether a "mixed-use" exclusion defined to include buildings with residential and commercial uses applies where additional uses are present.  Put differently, the defendants' reading of the mixed-use exclusion here as containing an exhaustive list of uses draws no support from *Bovis*, which did not even involve a mixed-use exclusion.

Similarly inapposite is *QBE Ins. Co. v. ADJO Contr. Corp.*, 934 N.Y.S.2d 36, 2011 N.Y. Misc. LEXIS 3973 (Sup. Ct. Nassau Cty. Apr. 5, 2011).  The court there found a residential work

exclusion inapplicable to construction of an apartment complex because that project was not "a single-family dwelling, a townhouse, a condominium, a co-operative, or a multi-track housing development" as defined in the exclusion. *Id.* at *151. That case, however, is distinguishable because the policy exclusion was for residential, not mixed, uses, and reasonably did not apply where a use in question fell outside the types of types of residential property enumerated in the list.

Defendants' reliance on *Aspen Ins. UK Ltd. v East Coast Pres. Co. LLC*, 934 N.Y.S.2d 32, 2011 N.Y. Misc. LEXIS 3875 (Sup. Ct. Kings Cty. June 9, 2011) is also wide of the mark. There, the court denied an insurer's motion for summary judgment based on a residential work exclusion, reasoning that it was an issue of fact whether the building under construction—a nursing home—fit into one of the enumerated categories of "human dwellings." *Id.* at *21. It was, therefore, a factual question whether the construction at issue fit into *any* of the enumerated categories. That situation is not present here, where it is undisputed that 303 East 51st contained *both* attributes necessarily for it to qualify as "mixed-use" under the Policy, and the legal issue is whether the presence of an additional uses disqualified the building from fitting that category.

Finally, the Court declines to follow *Brend Contracting Corp. v. United Nat'l Ins. Co.*, 831 N.Y.S.2d 346, 2006 N.Y. Misc. LEXIS 2782 (Sup. Ct. Kings. Cty. June 23, 2006). There, an insurer moved for summary judgment, based on a residential work exclusion, against a contractor who had been constructing a building of cooperative apartments. The exclusion in that case provided that:

> This insurance does not apply to injury or damage directly or indirectly arising out of, caused by or resulting from "your products" or "your work" in connection with any single custom house or a house which is part of multiple tract housing or condominium or other multi-unit residential projects. Projects which are mixed-use, any part residential or any part commercial, are considered to be a residential project subject to this endorsement.

[21]

2006 N.Y. Misc. LEXIS 2782, at *8. The court held:

> Here, where the exclusion provision fails to specifically include cooperatives in the types of buildings that constitute residential projects, questions of fact exist as to whether the exclusion is applicable in this case (see *Bovis Lend Lease LMB, Inc. v. Royal Surplus Lines Insurance Company*, 27 AD3d 84, 806 N.Y.S.2d 53 [1st Dept. 2005]).

*Id.* at *17.

To be sure, in one respect, *Brend* assists RCG and E51, in that it treats a mixed-use component of a residential exclusion, defined as "any part residential or any part commercial," as inapplicable where a third use (cooperatives) was present. But, for two reasons, the Court declines to follow *Brend*. First, the cited passage in *Brend* is dicta. Earlier in the opinion, the court had held that summary judgment was unavailable at all to the insurer, because it was an issue of fact whether the insurer had unduly delayed in disclaiming coverage and was estopped from doing so. *See id.* at *15–16. The court took up the notice argument first, holding that:

> [T]here is some evidence that [the insurer] received notice on July 29, 2003, which would mean that United took more than two months to notify plaintiff that it was disclaiming coverage. Here, questions of fact exist as to when United received notice of the occurrence and as to whether it disclaimed coverage in a timely fashion which precludes granting summary judgment to any party in this action.

*Id.* Second, *Brend*'s treatment of the issue relevant here was limited to a single sentence. The court did not identify, let alone analyze, the issue of whether the definition listing the attributes of a mixed-use structure excluded structures containing additional attributes. *See id.* at *17. And in support of its conclusion, *Brend* cited only *Bovis*, which, as noted above, is inapposite.

The Court therefore holds that, given its plain language, the Exclusion, insofar as it covers "mixed-use buildings," unambiguously applies here. Coverage is, therefore, barred, unless RCG and E51 can show that the Exception to the Exclusion is applicable.

### C.    Does the Exception to the Exclusion Apply?

Under the Exception to the Exclusion, RSUI must cover claims arising out of the insureds' operations or work "on or in commercial space in 'mixed-use buildings.'"  Because RSUI has shown that the Exclusion applies, for there to be coverage, RCG and E51 bear the burden of demonstrating that the Exception to the Exclusion applies.  *See supra* Section V.A. Defendants have not carried that burden.

The insurance claims in this case arise out of the March 15, 2008 collapse of the tower crane.  At the time, the crane was being "jumped" up the building's superstructure, and a new attachment point was being added at the 18th floor.  As noted, the crane was positioned on the south side of the building and was attached at the third and ninth floors of the building.  It is undisputed that the crane sat at ground level; however, there is no record evidence that the crane was attached to the building's ground floor, let alone to any arguably commercial space on the ground floor.  *See* JSF at *passim* (nowhere indicating that the crane was attached in any way to the building's ground floor).  Nor is there evidence that the building's second floor, which some witnesses have testified was intended to contain community space, was utilized in supporting the crane or any work on it.  *See id.* (nowhere identifying any crane-related work on the second floor).  It is, finally, undisputed that, at and above the fourth floor, 303 East 51st was purely residential.  JSF ¶ 171 (no community space above second floor); *see also id.* ¶ 140; *id.* at *passim* (describing no commercial space higher than the third floor).  Therefore, if the Exception to the Exclusion is to apply and preserve coverage for RCG and E51, it must be as a result of the crane's attachment point on 303 East 51st's third floor.  To assess this claim requires nuanced attention to the facts relating to that attachment point, as follows.

The crane's tower was stabilized by collars wrapping around it, which were secured to the building with metal I-beams. JSF ¶ 177. On March 15, 2008, three stabilizing I-beams were bolted to the crane tower's collar on one end, with the other end bolted to three points on the third floor. *Id.* ¶ 178. As noted above, various RCG and E51 witnesses testified in depositions that an area on the west side of the building was meant to be "knocked out" for connection to the commercial buildings immediately to 303 East 51st's west. RCG and E51 therefore contend that this space is properly treated as "commercial" space. *See id.* ¶¶ 121–25.

However, the Joint Statement of Facts stipulates that this allegedly-commercial area is limited to the space denoted as "T.O. Slab 47'-9'"", which is depicted in architectural drawing A-104. *Id.* ¶ 125 (citing Record Document # 52 (Dkt. 201-1 at p. 7)). Importantly, T.O. Slab 47'-9" appears in the upper left hand side of that drawing, on the building's *north*west side. *See* Dkt. 201-1 at p. 7. The crane, by contrast, was affixed to 303 East 51st's *south* side. JSF ¶ 173. Although the parties have agreed that three girders stabilizing the crane's tower were connected to three points on the building's third floor, *id.* ¶ 178, there is no record evidence whatsoever tending to show that the girders were connected to any part of T.O. Slab 47'-9"—*i.e.*, the portion of the third floor that was arguably commercial. Indeed, the Joint Statement of Facts does not refer to any document or testimony indicating that the crane was attached to or supported by the allegedly-commercial portion of the third floor.

RCG and E51 counter with two arguments. First, they argue that, to secure the I-beams to the third floor, RCG and its hired subcontractors must have performed "work" or "operations" "on or in" the "commercial southwestern side of the third floor." Defs.' Reply 11. But that claim finds no support in the Joint Statement of Facts; there, RCG and E51 stipulated that the arguably-commercial space on the third floor is limited to T.O. Slab 47'-9". This particular area

[24]

is not on the "*south*western side" of the third floor at all—it is instead on the *north*western side of that floor, on the opposite side of the building from the crane and its fixtures. *See* Dkt. 201-1 at p. 7. Nor have RCG and E51 adduced any evidence whatsoever supporting the claim (whose relevance, in any event, is uncertain) that workers must have travelled through T.O. Slab 47'-9" while undertaking crane-related work on the opposite side of the building. As to this argument, RCG and E51 have, therefore, failed to carry their burden to show the Exception's applicability.

Second, RCG and E51 theorize—without record support—that "one possible theory of recovery under the allegations in the underlying claims is that the decision to leave the entire western side of the third floor open destabilized the crane's attachment at the third floor." Defs.' Reply 11. This is significant, they contend, because New York law requires an insurer to defend where a "complaint contains any facts or allegations which bring the claim even potentially within the protection purchased, the insurer is obligated to defend." *Id.* (citing *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 74 N.Y.2d 66, 73 (1989)). RCG and E51 posit, in fact, that "the crane's attachment to any part of a floor containing commercial space would clearly constitute work or operations 'on or in commercial space,' as would the crane's use on the superstructure of the entire Building." Defs.' Reply 11 (underline in original).

These arguments are not persuasive. They are not based on evidence presented to this Court, but, instead, are based on speculation as to what a third party may conceivably someday claim, in the underlying litigation, to be the cause of the Accident.

However, such conjecture is insufficient to satisfy defendants' burden to prove coverage. It is well-settled that, in evaluating scenarios under which coverage is claimed to exist, the Court "will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them." *Stamford Wallpaper Co. v. TIG Ins.*, 138 F.3d

75, 81 (2d Cir. 1998).  And it is also well-settled that "[t]o defeat summary judgment . . .

nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to

the material facts,' . . . and they 'may not rely on conclusory allegations or unsubstantiated

speculation.'" *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Fujitsu Ltd. v. Fed.*

*Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  "Such an issue is not created . . . by surmise

or conjecture on the part of the litigants."  *United States v. Potamkin Cadillac Corp.*, 689 F.2d

379, 381 (2d Cir. 1982) (internal citations omitted).

      This case has proceeded through more than three years of discovery, and, as defendants

note, more than 50 underlying lawsuits regarding the Accident are pending.  In seeking to show

that their claims as to theories of liability in those cases are non-speculative, defendants have had

fertile ground to draw upon—in the form of more than 50 complaints or amended complaints

(and, where applicable, refined allegations) in these cases.  Defendants, however, have failed to

point to any actual allegations in the tort actions which would potentially trigger the Exception.

Instead, they offer only imagined, speculative scenarios in support of their argument that the

Exception has been triggered.

      Accordingly, RCG and E51 have failed to carry their burden of showing that coverage is

maintained by virtue of the Exception to the Exclusion.  RSUI's motion is therefore granted, and

defendants' motion denied.[11]

---

[11] Although it is sufficient to resolve this motion that defendants raised no triable issue of fact as
to whether the crane's supports were anchored to the claimed commercial space on the third
floor, the Court is constrained to note that RCG's and E51's proffered evidence that there was, in
fact, such space is exceedingly frail.  After more than three years of discovery, the sole evidence
supporting defendants' assertion that the third floor was to contain commercial space is the
deposition testimony of a number of defendants' principals.  That testimony, of course, post-
dates the Accident, and was offered—without any corroborating documentary evidence—at a

## CONCLUSION

For the foregoing reasons, RSUI's motion for summary judgment is granted.  RCG's and

E51's cross-motion for summary judgment is denied.  RSUI is directed to submit to the Court, no

later than August 6, 2012, a proposed form of judgment.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 31, 2012
        New York, New York

time when the defendants had a substantial incentive to establish coverage under the Policy.  Had
this matter proceeded to trial, such testimony, lacking any documentary corroboration, would
have been open to substantial impeachment.